IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CRIMINAL NOS. 09-256-2 |
| | : 09-256-3 |
| TERRELL DOBSON and JERROD ABNEY, | : |
| Defendants. | : |

**MOTION TO SUPPRESS EVIDENCE**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**RUFE, J.**                                                                                                                                 **June 18, 2010**

        The Indictment in the above-captioned case charges Co-Defendants Johnny Cobb ("Cobb"), Terrell Dobson ("Dobson"), and Jerrod Abney ("Abney") with twenty-three (23) counts, including allegations of conspiracy to use and traffic in counterfeit and unauthorized credit cards, use of a counterfeit access device, attempt to use a counterfeit access device, use of an unauthorized access device, aggravated identity theft, and the possession of fifteen (15) or more counterfeit or unauthorized devices.[1] Before the Court are Defendants Dobson and Abney's (collectively, "Defendants") separate Motions to Suppress all physical evidence recovered in connection with their arrest on March 12, 2009.[2] Upon consideration of Defendants' Motions, the Government's responses,[3] two evidentiary hearings and oral argument held thereon,[4] and resulting briefs from both

---

[1] Doc. No. 22.

[2] Doc. Nos. 79, 95.

[3] Doc. Nos. 82, 99.

[4] Doc. Nos. 98 (Transcript of suppression hearing held on March 16, 2010 ("March Tr.")) and 102 (Transcript of suppression hearing held on May 14, 2010 ("Tr.")).

parties,[5] the Court enters the following findings of fact and conclusions of law.[6]

## I. FINDINGS OF FACT[7]

1. On March 12, 2009, Richard Verna ("Verna") had been working as a loss prevention detective at Bloomingdale's in the King of Prussia Mall for six or seven months.[8] His duties included monitoring the store, acting as security, identifying suspicious activity, and apprehending individuals suspected of shoplifting, refund fraud, credit fraud, and the use of fraudulent credit cards.[9] Verna had been a loss prevention detective at various retail establishments for about five years.[10]

2. At approximately 3:45 PM. on March 12, 2009, Verna received a call from a sales associate named Maryanne Collins who worked in the handbags department.[11] Ms. Collins alerted Verna to the presence of an individual (later identified as Dobson) that she recognized.[12] Ms. Collins told Verna that Rebecca Childs, another loss prevention detective, considered the

---

[5] The Court allowed the parties to submit letter briefs following the hearing on May 14th. See Tr. at 98:20-23.

[6] In addition to the documents associated with Defendants Dobson and Abney's Motions to Suppress, the parties agreed to incorporate the record of Co-Defendant Cobb's suppression hearing, including the transcript from that proceeding, along with "motion papers and the briefing papers by counsel in that matter . . . ." See Tr. at 20:18 - 21:18.

[7] All findings of fact from this Court's Memorandum Opinion and Order denying Co-Defendant Cobb's suppression motion are incorporated herein as if fully set out. See supra, note 6.

[8] Tr. at 23:25 - 24:4; Def.'s Mot. to Suppress Physical Evidence Ex. A.

[9] Tr. at 23:9-24.

[10] Id. at 24:8-13.

[11] Id. at 29:9-19.

[12] Id. at 29:16-24.

individual to be suspicious.[13] Ms. Collins told Verna that he was purchasing an expensive Fendi handbag, valued at $1,265, and that he presented New York identification.[14] The suspicious individual previously noticed by Childs and John Resine, Verna's supervisor, had also presented New York identification.[15]

3. After Dobson made the purchase, Verna and Resine followed him through the store, into the mall, and then to the parking lot.[16] Verna saw Dobson enter a vehicle that he thought at the time was a green Ford Explorer.[17] Following standard procedure, Verna and Resine recorded the make and model, and tag information for the vehicle.[18]

4. Verna then returned to the Fendi counter at Bloomingdale's, where a manager informed him that a second individual (later identified as Abney), who presented New York identification, was trying to buy an expensive Fendi handbag valued at $1,110.[19] Abney attempted to make the purchase using two credit cards, which were both denied.[20]

5. When Abney left the Fendi counter without making a purchase, Verna and Resine followed him out of Bloomingdale's, into the mall, and then out into the parking lot, stopping their

---

[13] Id. at 54:14-23.

[14] Id. at 30:11-16, Tr. Ex 1.

[15] Id. at 41:11-15

[16] Id. at 42:10 - 43:3.

[17] Id. at 43:5-12.

[18] Id. at 43:14-21, Tr. Ex. 3.

[19] Id. at 30:21-25, 45:21 - 46:5, Tr. Ex. 1.

[20] Id. at 46:1-3.

pursuit at a crosswalk.[21] Approximately fifteen minutes had lapsed since Verna was initially alerted to the first suspicious individual at the handbag counter.[22]

6. Next, Verna called the Upper Merion Police Department to report to police dispatch what had happened.[23] He told dispatch that he had been following a man that he believed to be involved in credit card fraud, and that the man had attempted to use two cards that were declined.[24] Verna added that the man had presented New York identification, and that Bloomingdale's "had been having issues with individuals from New York using stolen cards to purchase handbags."[25] Verna provided the tag information and make and model of the first suspect's vehicle, and mentioned that he would be waiting for law enforcement at the crosswalk.[26]

7. A few minutes later, Officer Susan Bednar ("Bednar") met Verna at the crosswalk.[27] Verna briefly described what had happened, and gave Bednar the tag information, make and model of the vehicle he had previously seen.[28] He also described the two individuals, explaining that they had attempted to buy Fendi handbags, one of them successfully.[29] He

---

[21] Id. at 46:1-24

[22] Id. at 33:14-23.

[23] Id. at 33:8-13.

[24] Id. at 71:9-19.

[25] Id. at 71:20-25, Tr. Ex. 3.

[26] Id. at 72:4-18.

[27] Id. at 33:24 - 34:4.

[28] Id. at 34:7-11, 35:15-18.

[29] Id. at 35:15-23.

also noted that Bloomingdale's had previously experienced problems with individuals with New York identification committing credit card fraud.[30]

8. Bednar relayed Verna's comments to Officer Burkett ("Burkett"), who acted as backup officer on the call.[31] Burkett then broadcast the vehicle description via police radio.[32]

9. Corporal Brazunas ("Brazunas"), also with the Upper Merion Township Police Department, heard the report of suspicious activity at Bloomingdale's while on another call and drove over to Mall. When he reached the Mall parking lot, Brazunas called Burkett who gave him a description of the vehicle allegedly involved in the incident.[33]

10. Shortly thereafter, Brazunas observed a green SUV with New York tags driving within the Mall area (on a roadway identified at the evidentiary hearing as the "ring road").[34] He called in the tag number of the vehicle and received confirmation that it matched the number given out by Bloomingdale's security.[35] The time period between Brazunas hearing the initial police dispatch and him spotting the vehicle was approximately five or six minutes.[36]

11. Brazunas then followed the vehicle, which he identified as a green Ford Expedition, until he could safely make a car stop on the ramp leading to 76 West. Seeing that the vehicle windows were heavily tinted, Brazunas waited for Bednar and Burkett to arrive so that

---

[30] Id. at 34:12-14, 37:13-19.

[31] Transcript of suppression hearing held on July 10, 2009 ("Cobb Tr.") at 43:15-16, 44:9-24.

[32] Id. at 44:24-25, 45:1-2.

[33] Id. at 15:15-18.

[34] Id. at 16:21-25, 17:1-9.

[35] Id. at 18:2-20.

[36] Id. at 15:15-21.

another officer would be present when he made the initial contact with the occupants.[37]

12. Brazunas approached the vehicle on the driver's side while Bednar and Burkett approached on the passenger side. Both Brazunas and Burkett could see the figure of the rear passenger moving around in the car through the window.[38]

13. Brazunas walked up to the driver's side window and began conversing with Co-Defendant Johnny Cobb, the driver of the vehicle, informing him of their investigation and asking for identification and registration.

14. Burkett, seeing the movement by the backseat passenger, opened the door. He noticed the passenger's right hand down by his feet.[39] Burkett then grabbed the man, later identified as Jerrod Abney ("Abney"), and ordered him to step outside the vehicle.[40]

15. Detective Gershanick ("Gershanick") then arrived to assist the other officers at the scene. Gershanick, assigned to the Detective Division in the Economic Crimes Unit specializing in financial crimes, had been trained to identify counterfeit credit cards.[41]

16. Burkett led Abney to the rear of the Expedition and patted him down. While performing the pat-down, he felt something in Abney's sock that he believed to be a credit card.[42] Burkett questioned Abney regarding the object; Abney replied that it was his identification and gave

---

[37]Id. at 21:1-17.

[38]Id. at 21:1-2, 47:12-16.

[39]Id. at 47:12-19.

[40]Id. at 47:19-22, 80:3.

[41]Id. at 74:23-25, 75:1-16.

[42]Id. at 48:2-5.

Burkett permission to pull it out and look at it.[43]

14. Burkett retrieved Abney's New York identification and two credit cards from the sock. He then handed Gershanick the two credit cards, and Gershanick immediately recognized from his training and experience that they were counterfeit.[44] Based on that determination, Abney was placed under arrest.[45]

16. Gershanick then approached Dobson, who was standing outside the vehicle. Gershanick patted Dobson down and felt what he thought was a credit card in his front pants pocket.[46] He removed the object and found it to be a counterfeit credit card.[47] Based on this evidence, Dobson was placed under arrest.[48] A second search of Dobson's person revealed additional counterfeit cards.[49]

17. At the scene, Gershanick noticed several expensive items, specifically Sony Playstation 3's, in plain view in the vehicle.[50]

18. Seeing that the two passengers were removed from the vehicle by the other officers, Brazunas asked Cobb to do the same, citing safety concerns.[51] Officer Hiller performed a

---

[43]Id. at 48:6-7.

[44]Tr. at 78:5-17.

[45]Id. at 79:5-9.

[46]Id. at 80:5-11.

[47]Id. at 81:3-7.

[48]Id. at 81:8-12.

[49]Id. at 81:20 - 82:19.

[50]Id. at 82:23 - 83:25, 84:20 - 85:4.

[51]Cobb Tr. at 29:15-25, 30:1-2.

pat-down of Cobb after he exited the car.[52]

19. Gershanick asked for Cobb's consent to search the vehicle, to which he replied, "Yeah, go ahead."[53] Gershanick then directed Burkett to search the car.[54]

20. While Burkett was searching the car, Gershanick performed a second pat-down of Cobb.[55] In doing so, Gershanick felt an object in Cobb's upper right shirt pocket that he believed to be a receipt connected to the recent use of the counterfeit credit cards.[56] Gershanick removed the piece of paper from Cobb's pocket and recognized it as a receipt.[57] The receipt recorded the purchase of a Sony Playstation 3 game console from a Gamestop store.[58]

21. In searching the Expedition, Burkett discovered three additional credit cards later determined to be counterfeit. The last four numbers on one of the cards matched the last four numbers on the receipt found in Cobb's shirt pocket.[59]

## II. DISCUSSION OF APPLICABLE LAW

Defendants Dobson and Abney assert two arguments to exclude evidence obtained on March 12, 2009. First, they allege that their Fourth Amendment rights were violated when Corporal Brazunas performed the traffic stop because there was no reasonable suspicion that a crime

---

[52] Id. at 31:5-7.

[53] Id. at 82:12-18.

[54] Id. at 55:4-6.

[55] Id. at 82:17-20.

[56] Id. at 83:20-23.

[57] Id. at 83:23-24.

[58] Id. at 82:20-23.

[59] Id. at 84:12-18.

had been committed. Second, Defendants assert that the frisks conducted by police officers, which led to the discovery of counterfeit credit cards, were not supported by safety concerns or the requisite level of cause. The burden is on the Government to prove by a preponderance of the evidence that any warrantless search or seizure that occurred was lawful.[60]

### A. Law enforcement had reasonable suspicion justifying the seizure of the vehicle containing Defendants.

Dobson and Abney claim that the allegedly unlawful stop led directly to the discovery of the evidence at issue, and because it was obtained as a direct result of an unlawful seizure, the Court should suppress the evidence found by law enforcement on March 12, 2009 under the "fruit of the poisonous tree" doctrine.[61] The stop of the green Ford Expedition was based on the information provided by Bloomingdale's employees at the King of Prussia Mall, and in particular, the description of a car Dobson entered upon leaving the store. To evaluate whether the requisite level of reasonable suspicion was achieved by the information available to law enforcement, the Court looks to the Fourth Amendment of the Constitution.

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."[62] Significantly, the warrant requirement acts as protection against Fourth Amendment violations by law enforcement. At issue in the present matter is one of the exceptions to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that

---

[60] See United States v. Morales, 861 F. 2d 396, 399 (3d Cir. 1988).

[61] See Wong Sun v. United States, 371 U.S. 471 (1963).

[62] U.S. Const. amend. IV.

criminal activity is afoot" ("Terry stop").[63] The level of suspicion required by Terry is less than the probable cause standard and need not be supported by a preponderance of the evidence,[64] but the officer must have a "'particularized and objective basis' for suspecting legal wrongdoing"[65] and it must be more than a mere "hunch."[66] Law enforcement expertise and training can be a factor in the analysis.[67] A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it.[68]

        The Court begins its Terry analysis by evaluating the information provided by Bloomingdale's employees, relayed through officer communication, that led to the stop. With the testimony of Loss Prevention Detective Verna now part of the record, the Court finds that law enforcement had reasonable suspicion to stop the vehicle. Where the primary basis for a Terry stop is an informant's report or "tip", a Court must look to the 'veracity,' 'reliability,' and 'basis of knowledge' of that individual.[69] In the instant matter, the police received all information later used to identify and target Defendants' vehicle from Loss Prevention Officer Verna, who had garnered this information from his own observations and those of other Bloomingdale's employees. Despite a few discrepancies between Verna's testimony and the police dispatch records, easily attributable

---

[63] Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

[64] Id.

[65] United States v. Arvizu, 534 U.S. 266, 273 (2002) (referencing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

[66] Terry v. Ohio, 392 U.S. 1, 27 (1968).

[67] Supra, note 65.

[68] United States v. Nelson, 284 F.3d 472, 477-78 (3d Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

[69] Illinois v. Gates, 462 U.S. 213, 230 (1983).

to simple human error, we again find the information provided to be sufficiently reliable. The reliability of Verna's tip is bolstered by the face-to-face meeting that Officers Bednar and Burkett experienced with Verna. Also, Verna's position as a Loss Prevention Officer lends significant credence to the fact that his report was based on his experience and interest in detecting suspicious behavior at Bloomingdale's. Moreover, the initial report came directly from a Bloomingdale's employee who witnessed the suspicious activity, and the description of the suspect and the vehicle came directly from Verna. The Court is aware of no reason for the officers to doubt the veracity or basis of knowledge of either the salesperson from Bloomingdale's or Verna's later observations.

It is particularly important to note that the Court looks to the totality of the circumstances. Although Defendants argue that law enforcement had no reason to suspect that Dobson was making a fraudulent purchase, as the credit card that he used was accepted, the Bloomingdale's employees witnessed two transactions close in time that they determined to be suspect, given their experience with credit card fraud. In addition, Dobson had been previously identified as a suspicious individual, which was the initial reason Verna was alerted. Based on all that he learned and observed during that fifteen-minute period, Verna then passed all the information along to law enforcement. In sum, the Court finds the tip to be reliable, truthful, and based in the knowledge of the reporting informants.

Regarding the nature of the report to which the officers responded, the Court focuses next on the content of the report to determine whether it "provide[d] a particularized and objective basis for suspecting the particular person stopped of criminal activity."[70] Here, Defendants challenge

---

[70] United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (citing Florida v. J.L., 529 U.S. 266, 272 (2000)).

that the report does not establish that Defendants were anything but normal Bloomingdale's customers. We disagree. Law enforcement acted on a reliable tip based on the observations of Bloomingdale's employees, who communicated that individuals who likely were attempting to commit credit card fraud were in a particular vehicle in the vicinity of the mall. This information gave officers a particularized and objective basis for stopping the vehicle.

There is now additional evidence to support a determination of reasonable suspicion than the Court considered previously when it found that the traffic stop was lawful.[71] The Court finds that the information gathered from Verna and the other Bloomingdale's employees supplied law enforcement with a proper basis for the initial stop. There is no basis to revise our previous conclusion on this issue; the stop in question was lawful because it was supported by reasonable suspicion.

**B. The pat-down searches of Abney and Dobson did not violate the Fourth Amendment.**

Defendants' second argument relates to the events immediately after the vehicle was stopped. Specifically, like Cobb, they invoke the "fruit of the poisonous tree"[72] doctrine to suggest that the evidence found on their persons, counterfeit credit cards, should be suppressed due to alleged Fourth Amendment violations that occurred prior to and during the pat-downs. Under this doctrine, the government is prohibited from using direct or indirect evidence against someone when that evidence is seized during an unlawful search.[73]

The Fourth Amendment represents a balance between an individual's right to personal

---

[71] Doc. No. 69.

[72] Supra, note 61.

[73] Id. at 484.

security and the public interest. Reasonable searches and seizures are situations in which courts have decided the balance favors some limited invasion of personal security. A search is unreasonable if it is conducted without adequate justification; depending on the circumstances and the scope of the search, either reasonable suspicion or probable cause is required. The Supreme Court in Terry, and then Mimms (which applied Terry to the traffic stop context) made such a determination when it stated that officer safety can excuse pat-down searches if the officer has reason to believe that the individual is armed and dangerous.[74] It is an objective standard: the action must be reasonable to the particular officer given the relevant facts.[75]

In the instant case, essentially due to Abney's movements in the backseat of the vehicle, officers had already removed all occupants and had patted them down for officer safety by the time Detective Gershanick arrived at the scene. At the July 10, 2009 suppression hearing concerning Cobb, Officer Burkett ("Burkett") testified that the vehicle's windows were heavily tinted, which caused him to be particularly concerned about his and his fellow officers' safety.[76] Considering this evidence, Officer Burkett had an objectively reasonable basis for patting Abney down for officer safety. Once Burkett felt an object that appeared to be a credit card in Abney's pocket, he asked Abney for consent to pull the object out and look at it.[77] Abney consented.[78] Thus, we find no Fourth Amendment violation here.

---

[74] See supra, note 66; Pennsylvania v. Mimms, 434 U.S. 106 (1977). Officers, by the same reasoning, can ask an occupant of a vehicle to get out of the car during a traffic stop. Mimms, at 111.

[75] Supra, note 66, at 21-22.

[76] Cobb Tr. at 21:1-17.

[77] Id. at 48:6-7.

[78] Id.

Dobson asserts that the search of his person is unconstitutional under the Fourth Amendment. If law enforcement has probable cause to search an individual, the search need not be limited to a pat-down for officer safety. The pat-down search of Dobson occurred after Detective Gershanick discovered counterfeit credit cards on Abney's person. At this time the level of suspicion had risen to probable cause, meaning that "the facts and circumstances within [officers'] knowledge and of which [officers] had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that evidence of illegality could be found on the occupants of the vehicle.[79] During this search, Gershanick retrieved a credit card from Dobson's front pocket. This was not constitutionally problematic, because Gershanick knew that at least one occupant of the vehicle was likely involved in credit card fraud. The Court concludes that Detective Gershanick had probable cause to search Dobson after the discovery of contraband on another occupant of the vehicle.

> **C. The Court finds no basis to reconsider its previous determination that the search of the vehicle was reasonable under the Fourth Amendment.**

It is not clear from the record whether Defendants Dobson and Abney argue, as Co-Defendant Cobb did, that Cobb's consent to search the vehicle was involuntary. Regardless, Dobson and Abney have offered no additional evidence on the issue of Cobb's consent, and as the Court finds the traffic stop and pat-down searches of Defendants to be constitutionally sound, we find accordingly that the consent to search was given knowingly and voluntarily. Further, as previously noted in our Memorandum Opinion on Co-Defendant Cobb's suppression motion, there was independent probable cause to search the vehicle at that time.

---

[79] Carroll v. United States, 267 U.S. 132, 162 (1925).

## III.  CONCLUSIONS OF LAW

1. The information provided by Loss Prevention Officer Richard Verna and other Bloomingdale's employees was sufficiently reliable to provide a basis for a <u>Terry</u> stop.

2. Relying on the information provided, Corporal Brazunas' decision to seize the vehicle was supported by reasonable suspicion and did not violate the Fourth Amendment.

3. Officer Burkett had an objectively reasonable basis for patting Abney down for officer safety.

4. Detective Gershanick had probable cause to search Dobson for contraband, given the recent discovery of counterfeit credit cards on Abney's person.

6. The search of the vehicle did not violate the Fourth Amendment, because two of the occupants had been arrested and police had probable cause to believe that there was contraband inside.

7. Detective Gershanick obtained Co-Defendant Johnny Cobb's voluntary consent to search the vehicle that he was driving.[80]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Suppress Physical Evidence will be **DENIED**.  An appropriate Order follows.

---

[80] These conclusions are based upon the complete record in this matter, including the evidence presented at Cobb's suppression hearing.